William G. MAHONEY, et al., Plaintiffs,

v.

RFE/RL, INC., Defendant.

Civ. A. No. 91–1842–LFO.

United States District Court,
District of Columbia.

Nov. 24, 1992.

Jane M. Picker, Kenneth J. Kowalski, Gordon J. Beggs, Fair Employment Practices Clinic, Cleveland, OH, William Bransford,

Suzanne L. Lawrence, Shaw, Bransford and O'Rourke, Washington, DC, for plaintiffs.

N. Frank Wiggins, Cohn and Marks, Washington, DC, for defendant.

## MEMORANDUM AND ORDER

OBERDORFER, District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment. Plaintiffs claim that defendant, which employed them at its workplace in Munich, Germany, terminated them on the basis of their age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34. Defendant maintains that German law required it to engage in age-based discrimination and that the ADEA's "foreign laws" exception therefore applies. If defendant prevails on its motion for summary judgment, the action must be dismissed. If plaintiffs prevail on their motion, however, only defendant's liability will be established; plaintiffs will be entitled to proceed to trial and attempt to establish a willful violation of the ADEA, entitling them to double damages under 29 U.S.C. § 626(b). Thus, plaintiffs move for partial summary judgment. For the reasons that follow, defendant's motion for summary judgment will be denied and plaintiffs' motion for partial summary judgment will be granted.

### I.

Defendant RFE/RL, Inc. is best known under the names of its broadcast services, Radio Free Europe and Radio Liberty. Defendant is a Delaware non-profit corporation with its principal place of business in Munich, Germany. It employs more than 300 United States citizens at its facility in Munich. Defendant's activities are supported almost exclusively by federal funds, and its funding is subject to action by four Congressional committees. Pursuant to statute, defendant's operation is overseen by a federal agency, the Board for International Broadcasting (BIB), the members of which are appointed by the President with the advice and consent of the Senate. 22 U.S.C. § 2872. The membership of the BIB and defendant's Board of Directors is the same.

Plaintiffs William G. Mahoney and Roy De Lon were employed at defendant's Munich facility until the time of their terminations. Both were terminated by defendant after, and because, they had reached the age of 65. The union contract covering defendant's employees in Germany expressly provides for mandatory retirement at age 65. The contract, which took effect on April 1, 1982, contains exceptions to the mandatory retirement provision for certain managerial positions and for employees who would qualify for pension benefits within three years. The contract has no termination date but can be changed through a new agreement of the parties.

Plaintiffs brought this action under the ADEA on behalf of themselves and defendant's similarly situated U.S.-citizen employees filing consents pursuant to 29 U.S.C. §§ 216(b) & 626(b).[1]

## II.

Summary judgment is appropriate only if the evidence reveals "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The parties do not materially dispute the facts of this case; their dispute is purely a legal one.

Defendant concedes that it terminated plaintiffs because of their age. Moreover, defendant admits that its actions would have violated the ADEA were it not for a statutory exception found at 29 U.S.C. § 623(f):

> It shall not be unlawful for an employer, employment agency, or labor organization—
>
>> (1) to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section ... where such practices involve an employee in a workplace in a foreign country, and compliance with such subsections would *cause such employer ... to violate the laws of the country* in which such workplace is located.... (emphasis added)

Defendant contends—as it must in order to qualify for the exception—that compliance with the ADEA would cause it to violate the laws of Germany.

■ Defendant's principal argument is that a mandatory retirement age is a deeply embedded concept in German labor practice. Defendant's expert, Professor Spiros Simitis, testified that it is the "general policy of the unions" to insist upon a mandatory retirement age, and that such provisions are contained in the vast majority of collective bargaining agreements in Germany. He also opined that such nearly ubiquitous union-contract terms were considered in Germany to have "legal" force.

■ However, an expert witness (even one with Professor Simitis's impressive credentials) cannot tell a court how to interpret the word "law" as Congress used it in § 623(f)(1). That is a question of federal law that turns on Congressional intent. *See, e.g., United States v. 594,464 Pounds of Salmon,* 871 F.2d 824, 826–28 (9th Cir.1989). Professor Simitis testified that the mandatory retirement provision in the union contract had "legal" force in Germany in the sense that it was legally binding. That is precisely the sense in which such contracts in this country may be said to have "legal" force; yet they are not ordinarily thought of as "laws." Two crucial facts about the mandatory retirement provision at issue here remain undisputed by the defendant. First, the provision is part of a contract between an employer and unions—both private entities—and has not in any way been mandated by the German government. Second, the provision does not have general application, as laws normally do, but binds only the parties to the contract.

■ Defendant's argument based on German labor "practice" and "policy" is unpersuasive. Practices and policies, even when embodied in contracts, are not "laws." The ADEA is a remedial statute and exceptions to it are to be construed narrowly. *Sexton v. Beatrice Foods Co.,* 630 F.2d 478, 486 (7th Cir.1980) (citing *A.H. Phillips, Inc.*

---

1. It appears that two individuals, Nicolas Munteanu and Vasco Ivanov, have filed consents to participate in this action as party-plaintiffs pursuant to this Court's Orders of February 28, 1992 and March 10, 1992.

*v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945)). Although there appears to be no authority directly on point, it is difficult to imagine that Congress intended the term "laws" to extend beyond its ordinary meaning to encompass practices, policies and contracts. Congress knows how to address the "policies or practices" of foreign governments, as it has done expressly in legislation condemning such discrimination in the context of arms trading. 22 U.S.C. § 2755(a) & (b)(1). The foreign laws exception of § 623(f)(1), in contrast, applies only where another country's *laws* would be violated by compliance with the ADEA.

■ A hypothetical raised at oral argument is instructive here. Consider a situation in which a foreign country's labor unions came to be controlled by a group committed to the exclusion of a racial minority. It can hardly be doubted that Title VII of the Civil Rights Act of 1964 would not allow a U.S. employer in that country to enforce racist policies under the guise of obeying the foreign labor unions.[2] The ADEA, like Title VII, represents a clear and strong remedial mandate of the United States Congress. Where a foreign labor union policy collides with that mandate, the law of the United States cannot be expected to bow down. This proposition seems to have particular force where an employer is as closely tied to the United States government as the defendant is. It is true that the Court of Appeals for the District of Columbia Circuit has held that defendant is not itself a government-controlled corporation. *Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1125 (D.C.Cir.1985). But the court in *Ralis* recognized that defendant is federally funded and provided for by Congressional statute; and there is no denying that in many ways, at least functionally, the defendant represents the United States to the world as a quasi-government entity. The exception for conflicting foreign laws, an exception that must be construed narrowly, should not apply in the circumstances presented here.

■ In response to the above hypothetical, defense counsel at oral argument raised the issue of the timing of the relevant discriminatory action. If the hypothetical racist group took control of the country's labor unions at some point in the *future*, counsel argued, then it would indeed violate Title VII for a U.S. employer to enforce the racist policies insisted upon by the unions. If, however, the employer's policy had been adopted *before Title VII became applicable extraterritorially*, then (according to defendant) the employer's ongoing policy would not violate Title VII. Defendant contends that the latter scenario is analogous to the case at bar. The mandatory retirement provision has been part of the union contract since April 1982; but the ADEA has applied outside the United States only since October 1984. *See* 29 U.S.C. § 623(f) & (g) (as amended by Pub.L. No. 98–459, 98 Stat. 1792 (Oct. 9, 1984)).

■ Defendant's argument misses the mark. First, it does not go to the issue of whether the foreign labor union "policy" or "practice" is *law*. Defendant has raised a defense, not of impossibility or futility, but of foreign law. Therefore, it is not sufficient that compliance with the ADEA be difficult or impossible under a contract or under a firmly established national norm; in order to make out a defense under § 623(f)(1), defendant must show that compliance would cause defendant to violate German law. Second, the argument is unpersuasive in any event. It amounts to an assertion that the relevant discriminatory act is the adoption of the mandatory retirement provision (i.e., its incorporation into the union contract in 1982) rather than the application of the provision to the plaintiffs. Although no authority is cited for it, the argument might well rely on the approach taken in cases such as *Lorance v. AT & T Technologies, Inc.*, 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989), in which the Supreme Court held that the adoption of a facially neutral but discriminatory seniority system is the relevant discriminatory act for

---

**2.** The Civil Rights Act of 1991 extended Title VII to apply extraterritorially. *See* 42 U.S.C. § 2000e–1(b) & (c) (as amended by Pub.L. No. 102–166, 105 Stat. 1071 (Nov. 21, 1991)). The 1991 Act also added a foreign laws exception

nearly identical to that contained in the ADEA. 42 U.S.C. § 2000e–1(b) (an action otherwise prohibited is not unlawful if it "would cause such employer ... to violate the law of the foreign country in which such workplace is located").

purposes of the statute of limitations.[3] Even in *Lorance,* however, the Court made clear that a *facially discriminatory* system, like the one in the instant case, can be challenged at any time, because such a system "by definition discriminates each time it is applied." *Id.* at 912 n. 5, 109 S.Ct. at 2269 n. 5. The timing of events here does not justify application of the foreign laws exception.

■ In addition to German labor policy, defendant places reliance on five decisions rendered by German labor courts. When the ADEA was amended by Congress to apply to defendant's employees in Germany, defendant initially attempted to accommodate the new law by signing individual employment contracts that allowed certain employees to continue working past the age of 65. However, the company's "works council"—which is bound by German law to give effect to a union contract—rejected the individual contracts because they abrogated the mandatory retirement provision in the union contract.[4] Defendant unsuccessfully appealed to the German labor courts, and it is those courts' decisions that defendant now cites as prohibitive German law.

The labor court decisions, however, involved a narrower issue than that addressed here. Those decisions simply held that the *union contract* did not permit a retirement age higher than 65; they merely enforced the contract upon the parties to it (in particular, against the defendant). They did not hold that anything in *German law* compelled the decisions reached. Plaintiffs in this action are challenging the application of the contract's discriminatory provision itself, not the lack of individual employment contracts. If overseas employers could avoid application of the ADEA simply by embedding an age-discriminatory provision in a contract, having a foreign court enforce the contract, and calling the court's decision "law," then the Act's extraterritorial provisions would be largely nullified, for employers could easily contract around the law.

Defendant contends that by attempting to utilize individual employment contracts and appealing to the German labor courts, it did all that could be expected of it to comply with the ADEA. It is clear from the undisputed facts, however, that it could have done more to come into compliance. Most important, the defendant did not fully pursue the possibility of achieving an actual change in the union contract. It is true that some of defendant's officers had discussions about the possibility of eliminating the mandatory retirement provision, but these discussions were limited and informal, at least before 1991. Defendant did not pursue serious negotiations with the unions on the issue. In contrast, it did negotiate various other changes in the union contract, including a comprehensive new salary structure effective May 1, 1989. Nor did the defendant pursue the option of mediation in connection with the mandatory retirement issue. Finally, it could have given a six-month notice, as permitted by the agreement's terms, to terminate the contract or a specific provision of it. Defendant argues that all of these possibilities would have been futile, and in particular that a unilateral termination would have been fruitless because the substantive provisions of a union contract remain in effect until a new contract is reached. At the very least, however, when terms of a union contract are terminated, they cease to be binding as rigid rules and the potential thus arises for pursuing both individual contracts and negotiation. *See* Weiss, *Labour Law and Industrial Relations in the Federal Republic of Germany* 128 (1987).

■ In any event, to the extent that defendant has demonstrated a genuine issue of fact as to the "futility" of these various options, the futility arises from the policies of the German labor unions, and not from German *law.* The defendant is essentially arguing that the German unions simply will not allow it to eliminate the mandatory retire-

3. *Lorance* was legislatively overruled by the Civil Rights Act of 1991, *see* 42 U.S.C. § 2000e–5(e)(2) (as amended by Pub.L. No. 102–166, 105 Stat. 1075 (Nov. 21, 1991)), but the reasoning of the case may nevertheless provide authority for defendant's argument.

4. Presumably the works council (which is a private rather than a government entity) would also enforce a provision that permitted work past the age of 65 if it were included in a union contract.

**6**

ment policy. But the United States Congress will not allow it to *retain* the policy. Of the two, only Congress makes law.

 Finally, the defendant argues briefly that applying the ADEA to its operations in Munich would violate international law. But defendant does not identify any principle of international law that would be violated by such an application of the law. Where there is a basis for the exercise of jurisdiction (such as nationality) and such exercise is reasonable, U.S. law may properly be applied overseas. *See Restatement (Third) of the Foreign Relations Law of the United States* §§ 402(2) & 403 (1987); Brilmayer *et al., Introduction to Jurisdiction in the American Federal System* 302 (1986). Here, there is no actual conflict with German law, Congress has expressed a strong interest in protecting U.S. nationals from age discrimination, and the exercise of jurisdiction is reasonable. Application of the ADEA in the present setting would not result in a violation of international law.

&ast; &ast; &ast;

For the foregoing reasons, it is this 24th day of October, 1992, hereby

ORDERED: that plaintiffs' motion for partial summary judgment is GRANTED; and it is further

ORDERED: that defendant's motion for summary judgment is DENIED; and it is further

DECLARED: that defendant is liable to plaintiffs for discharging them because of their age in violation of 29 U.S.C. § 623; and it is further

ORDERED: that the parties shall attend a pretrial conference on *January 28, 1993 at 9:30 a.m.,* in Courtroom No. 3.; and it is further

ORDERED: that the trial in this matter shall commence on *February 17, 1993* and is scheduled for 3 days.