Garland DENTY, Plaintiff,

v.

SMITHKLINE BEECHAM CORP., Defendant.

Civ. A. No. 93–6978.

United States District Court, E.D. Pennsylvania.

Nov. 7, 1995.

---

Ronald H. Surkin, Richard, Di Santi, Hamilton and Gallagher, Media, PA, for Garland Denty.

Steven B. Feirson, Paul D. Snitzer, Henry A. Olsen, III, David M. Howard, Dechert, Price and Rhoads, Philadelphia, PA, for SmithKline ·Beecham Corporation.

## OPINION

LOUIS H. POLLAK, District Judge.

Plaintiff Garland Denty alleges that defendant SmithKline Beecham Corporation (SBC) denied him promotions due to his age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634, and the Pennsylvania Human Relations Act (PHRA), 43 Pa.S.A. §§ 951–963. Plaintiff also alleges that the defendant violated the ADEA and the PHRA by "creating intolerable working conditions for Plaintiff because of his age and because he filed a complaint of discrimination." Complaint, ¶ 33. SBC has moved for summary judgment on the failure-to-promote claims. Defendant's primary contention is that the extraterritorial applica-

tion of the ADEA and the PHRA do not reach this case because the positions plaintiff sought were located outside the United States for an English company.

## I. Factual Background

In 1984, Garland Denty was hired by Smith Kline French, a Pennsylvania corporation, as Director of Quality Assurance, a job he held until January 1989, when he was given the title Director of Manufacturing Operations/Technical Services, International. Denty performed these jobs at SmithKline's offices in Philadelphia. In April 1989, Smith-Kline merged with the Beecham Group plc., a British corporation. The resulting company was called SmithKline Beecham plc (SB plc). According to its 1994 annual report, filed with the SEC, SB plc is organized under the laws of England, and its headquarters are located in Brentford, Middlesex, England. Plaintiff's Ex. 21, at 1. The defendant, SBC, is the American branch of SB plc. It is a wholly-owned subsidiary of SB plc.

A great deal of reorganization followed the merger, including the creation of certain new positions. According to plaintiff, in 1990, he was told that he would be promoted to Vice-President of Technical Services/Plant Operations. Later that year, however, plaintiff allegedly was informed that he would not be promoted to this position because of his age. At the time, plaintiff was 52 years old. Plaintiff claims that in 1992 he applied for four other positions at the vice-president level—the exact job titles do not appear in plaintiff's complaint—and that he was denied these positions on the basis of age. Plaintiff alleges that all these positions were filled by men younger than himself.

The promotion decisions at issue in this case were made by SB plc executives in England, while Denty worked for SBC in Philadelphia. It is undisputed that all the positions Denty sought were based outside the United States.[1]

## II. Whether SBC Is the Proper Defendant

Defendant argues that Denty has sued the wrong party. SBC has produced uncontradicted evidence that all the positions Denty sought were with SB plc, the English corporation which is the parent company of the defendant, SBC. Denty argues, however, that SBC has waived this argument by failing to plead it as an affirmative defense. Denty further argues that SBC is estopped from making this argument because, in its answer, SBC in effect admitted that it was the proper defendant. Denty has indicated that if SBC has not waived this argument, or if SBC is not estopped from making it, Denty would seek leave to amend his complaint to add SB plc as a defendant.

Denty's waiver argument is based on his assertion that "[t]he defense that plaintiff has sued the wrong party is an affirmative defense" that is waived if not pled in the answer. Plaintiff's Mem. at 26. Denty bases his estoppel argument primarily on a series of statements in defendant's answer, which acknowledge that following the merger of SmithKline Beckman and the Beecham Group, a reorganization occurred. In the answer, defendant stated that "Smith-Kline"—defined earlier in the answer as SBC—was responsible for the reorganization. According to Denty, the reorganization included filling the positions Denty sought and which he allegedly was denied because of his age. Thus, Denty argues, SBC has admitted that it—not SB plc—is the entity that made the allegedly discriminatory decisions. Moreover, Denty further asserts that throughout this litigation, which included proceedings before the Pennsylvania Human Relations Commission, the defendant never distinguished between SBC and SB plc, but instead responded to Denty's allegations as if it were the correct party. Having affirmatively "admitted" that it is the correct party, and having failed to distinguish itself from SB plc, Denty argues, the defendant cannot now assert that SB plc is the proper defendant.

---

1. According to defendant, four of the five positions were located in England, and the fifth was located in Australia. Plaintiff neither confirms nor denies the locations of these jobs but acknowledges that they all would have been performed outside the United States.

■ The defenses of estoppel and waiver generally are granted only when prejudice can be shown. Thus, although the defense of failure to sue the proper party is indeed considered to be an affirmative defense which must be pled in the defendant's answer, *see Bokunewicz v. Purolator Products, Inc.*, 907 F.2d 1396, 1402 (3d Cir.1990), the defense is not waived unless prejudice to the plaintiff can be shown. In *Bokunewicz*, the Third Circuit stated that "failure to [plead the argument that the defendant was the wrong party] is a waiver of the defense *unless leave of court is granted to amend* under Fed.R.Civ.P. 15." *Id.* (quoting and adopting district court opinion) (emphasis added). Under Rule 15, "leave shall be given when justice so requires." Fed.R.Civ.P. 15(a). According to the 1937 Advisory Committee Notes, leave to amend can be granted "when the adverse party has not been misled and prejudiced." *See also* Wright & Miller, Federal Practice & Procedure § 1278 ("[T]he substance of many unpleaded affirmative defenses may be asserted by pretrial motions, particularly in the absence of prejudice.") Prejudice similarly is an essential element of estoppel. *See Walter v. Netherlands Mead N.V.*, 514 F.2d 1130, 1140–41 (3d Cir.1975).

■ Plaintiff has shown no evidence that he was prejudiced by defendant's alleged failure to alert him to its argument that SBC is not the proper defendant in this case. The only prejudice plaintiff has asserted would arise if the court allows defendant to argue that SB plc is the proper defendant without giving plaintiff the opportunity to add SB plc as a defendant. *See* Plaintiff's Mem. at 29. This I do not propose to do. Rather, plaintiff should be given leave to add SB plc as a defendant. Because I conclude below, however, that the ADEA does not apply to the plaintiff's failure-to-promote claim, the formality of an amended complaint will be unnecessary.

### III. The Extraterritorial Application of the ADEA

■ The ADEA makes it "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). Until 1984, it appeared that the ADEA had no extraterritorial reach. All seven of the federal courts of appeals that examined the ADEA as it stood in 1984 have concluded that it did not protect American citizens working abroad for a foreign subsidiary of an American corporation. *See Lopez v. Pan Am World Services, Inc.*, 813 F.2d 1118 (11th Cir.1987); *S.F. De Yoreo v. Bell Helicopter Textron, Inc.*, 785 F.2d 1282 (5th Cir.1986); *Ralis v. RFE/RL, Inc.*, 770 F.2d 1121 (D.C.Cir.1985); *Pfeiffer v. Wm. Wrigley Junior Co.*, 755 F.2d 554 (7th Cir.1985); *Zahourek v. Arthur Young & Co.*, 750 F.2d 827 (10th Cir.1984); *Thomas v. Brown & Root, Inc.*, 745 F.2d 279 (4th Cir.1984); *Cleary v. U.S. Lines, Inc.*, 728 F.2d 607 (3d Cir.1984). These courts applied the well-established presumption against extraterritorial application of federal law. *See EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) ("It is a longstanding principle of American law that 'legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' ") (quoting *Foley Brothers, Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949)). This presumption reflects the principle of international comity, under which the United States should avoid interference with the laws of another sovereign over conduct occurring within its territory. Before 1984, no extraterritorial application of the ADEA would be read into the statute because it did not explicitly provide that it applied to any conduct outside the boundaries of the United States.

■ In 1984, Congress amended the ADEA to give it a limited extraterritorial reach. As the Supreme Court stated, "The expressed purpose of these changes was 'to mak[e] provisions of the Act apply to citizens of the United States employed in foreign countries by U.S. corporations or their subsidiaries.' " *Arabian, supra*, at 259, 111 S.Ct. at 1236 (quoting S.Rep. No. 467, 98th Cong., 2, *reprinted in* 1984 U.S.C.C.A.N. 2974, 2975)). This purpose was effected

through changes to two provisions. First, Congress amended the definition of "employee" to provide: "The term 'employee' includes any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country." 29 U.S.C. § 630(f). Second, Congress enacted a new subsection of 29 U.S.C. § 623—the primary operative provision of the ADEA, which lists prohibited employer practices. The new subsection provides:

(1) If an employer controls a corporation whose place of incorporation is in a foreign country, any practice by such corporation prohibited under this section shall be presumed to be such practice by such employer.

(2) The prohibitions of this section shall not apply where the employer is a foreign person not controlled by an American employer.

(3) For the purposes of this subsection the determination of whether an employer controls a corporation shall be based upon the—

(A) interrelation of operations,

(B) common management,

(C) centralized control of labor relations, and

(D) common ownership or financial control,

of the employer and the corporation.

29 U.S.C. § 623(h).[2] Together, the 1984 amendments establish that the ADEA applies abroad only when (1) the employee is an American citizen and (2) the employer is controlled by an American employer.[3] Noncitizens working outside the United States are not protected because they are not considered "employees." And American citizens working abroad for companies not controlled

by American companies are not protected because the practices of such companies are not covered by the ADEA.

### A. Whether Denty's Claim Invokes the Extraterritorial Application of the ADEA

Defendant argues that the ADEA does not apply to the employment decisions Denty challenges because they all involved positions outside the United States for an English corporation. Denty asserts that the nature of his claim is purely domestic—involving an American citizen working for an American company in the United States. According to Denty, the site of the workplace is the key factor in determining whether a claim exceeds the extraterritorial reach of the ADEA. Denty argues that the relevant work site was SBC's Philadelphia office, where he worked at the time of the alleged discrimination.

The proposition that the site of the workplace determines the application of the ADEA is indeed supported by the cases Denty cites. The courts which denied the extraterritorial application of the pre–1984 ADEA held that it was the place of the plaintiffs' employment that led to the dismissal of their claims. In those cases it did not matter that the plaintiffs worked for American corporations or that the allegedly discriminatory decisions were made in the United States; the ADEA claims failed merely because the site of plaintiffs' employment was outside the United States. Thus, in *Wolf v. J.I. Case Co.*, 617 F.Supp. 858 (D.Wisc.), the court stated:

Regardless whether the plaintiff worked for an American company or its foreign subsidiary, or both, it is his place of employment which governs the applicability

---

**2.** This subsection was originally codified as 29 U.S.C. § 623(g), creating the anomaly of having two sections so designated. This mistake was corrected in a 1986 amendment.

**3.** The 1984 amendments also establish that even a covered entity need not comply with the ADEA if to do so would violate the laws of the country in which it operates. 29 U.S.C. § 623(f)(1). Thus, in *Mahoney v. RFE/RL, Inc.*, 47 F.3d 447 (D.C.Cir.1995), the court held that an American corporation operating in Germany did not violate

the ADEA by terminating an American citizen due to his age, when its labor contract mandated retirement at age sixty-five. Given "the German laws standing behind such contracts," the employer's "obligations under foreign law [would have] collide[d] with its obligations under" the ADEA if the ADEA applied in this situation. *Id.* at 450. According to the court, Congress, "quite sensibly" resolved the potential international conflict of laws "by relieving the employer of liability under the Act." *Id.*

of the ADEA. *Pfeiffer, supra,* 755 F.2d at 559; *Cleary, supra,* 728 F.2d at 610.

The plaintiff's allegation that he was supervised and controlled by top management of the defendants based in the United States is not of any legal significance so long as the plaintiff performed his work abroad. The plaintiffs in *Cleary, Zahourek,* and *Thomas* were all denied the protection of the ADEA despite the fact that they were directly employed by American companies and not by foreign subsidiaries of the companies.

In sum, the court finds that the plaintiff's work station was outside the United States. As a result, the plaintiff['s] termination claim is not cognizable under the ADEA as it existed at the time he was terminated.

617 F.Supp. at 863. Following the passage of the 1984 amendments, the focus on the plaintiff's work site derives directly from the language of the statute: an "employee" is defined to include United States citizens employed "in a workplace in a foreign country." 29 U.S.C. § 630(f).

The proposition that the site of the workplace determines the applicability of the ADEA—a proposition in which I acquiesce—does not, however, lead to the conclusion advanced by Denty. The employment decisions at issue here involve Denty's application for positions outside the United States. The relevant work site is the location of these positions, not the location of Denty's employment at the time of the alleged discrimination. In *Lopez, supra,* the plaintiff was an American citizen who, while in the United States, applied for work in Venezuela. The Eleventh Circuit held that the ADEA did not protect the plaintiff in this situation because "[t]he work station for appellant's job *would have been* Caracas, Venezuela." 813 F.2d at 1120 (emphasis added). Here, Denty's workplace *would have been* England or Australia. The relevant work site in a case of alleged discrimination against a job applicant is the location of the position for which the plaintiff applied. Denty attempts to distinguish *Lopez* on the ground that it involved an "original application" for employment and not, as in the present case, an application for promotion from within a company. Plaintiff's Mem. at 19 n. 13. Nothing in the text of the ADEA, however, supports a distinction between applications for a promotion and applications for a new job.

■ Denty presents a series of hypotheticals that purportedly demonstrate the absurdity of not applying the ADEA to foreign-based work sites of foreign companies. If the ADEA does not apply, Denty asserts, a foreign company with an office in the United States could lawfully discriminate against its American employees on the basis of age by transferring them to the company's foreign office, where, under the laws of the foreign state, the employees could be dismissed on the basis of age. This hypothetical method of evading the ADEA has already been considered by two courts, which have concluded that the problem can be addressed without redefining the definition of a workplace. In *Wolf,* the court stated, "An exception is made when it is necessary to prevent a transparent evasion of the Act, as where an employer transfers an employee abroad for a short period of time for the purpose of avoiding the Act's coverage." 617 F.Supp. at 861. Similarly, in *Pfeiffer,* the Seventh Circuit stated:

All this is not to say, however, that if Pfeiffer had worked for Wrigley in the United States, and Wrigley to get around the Age Discrimination in Employment Act had moved him abroad in his last day (or week, or month—we need not explore the outer bounds of the limiting principle sketched here) and then fired him, it would be immune from liability under the Act. In that hypothetical case Pfeiffer's relevant work station would be (we may assume, without deciding) the United States.

755 F.2d at 559. Even if these courts are mistaken that such an exception can be read into the statute, the problem is one to be fixed by Congress, which limited the extraterritorial application of the ADEA. In any event, the problem Denty posits is not presented by his case, the ADEA is clear that it does not apply to employment abroad with foreign-controlled employers, and I need not address the hypothetical failings of the statute.

## B. Whether SB plc Is Controlled by An American Employer

Because the positions Denty sought were outside the United States, the ADEA only applies if SB plc can be considered to be controlled by an American employer. The ADEA declares that its prohibitions apply when an "employer controls a corporation whose place of incorporation is in a foreign country." 29 U.S.C. § 623(h)(1). Conversely, the ADEA does not apply "where the employer is a foreign person not controlled by an American employer." 29 U.S.C. § 623(h)(2). Denty does not dispute the fact that SB plc was incorporated in England. Nor does Denty dispute the fact that SB plc is the 100% owner of SBC, a fact that makes it extremely difficult to believe that SB plc is controlled by SBC.

Nonetheless, applying the four-factor test established by the ADEA, Denty argues that SB plc and SBC are indistinguishable and should be considered a "single employer." The "single employer" inquiry advocated by Denty is not the correct inquiry in this case. It derives from cases in which courts have considered whether the number of employees of two nominally distinct entities can be aggregated in determining whether a firm employs the minimum number of employees necessary to be covered by the National Labor Relations Act and, by extension, the ADEA. *See Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965) (applying the single employer theory to a case arising under the NLRA); *Rogers v. Sugar Tree Products, Inc.,* 7 F.3d 577, 582–84 (7th Cir. 1993) (applying the single employer theory to an ADEA case). In this case, the issue is not whether SB plc and SBC should be considered a single employer but whether Denty sought employment with an employer "controlled" by an American firm. Nonetheless, the four-factor test used to determine whether two firms should be considered a single employer is identical to the test specified by the ADEA for "the determination of whether an employer controls a corporation." 29 U.S.C. § 623(h)(3). These factors are "interrelation of operations," "common manage-ment," "centralized control of labor relations," and "common ownership or financial control." *Id.*

Plaintiff has presented substantial evidence as to all these factors. Operations at SB plc and SBC are highly integrated, organized by the type of work performed and not by location; thus, SmithKline Beecham Pharmaceuticals operates as a unified corporate division in England, in the United States, and elsewhere. Deposition testimony further reveals the interrelationship between the two firms in that SBC employees such as Denty report directly to SB plc employees. Moreover, the two corporations have common management—one CEO, whose offices are in England. Labor relations are similarly centralized—directed by a single Director and Vice–President, whose office is also in England. One annual report is prepared for the two entities, in which revenues are reported on a consolidated basis. *See* Plaintiff's Ex. 21. The annual report speaks of the corporation in singular terms, as an English corporation.

While all of this suggests that SmithKline Beecham's American and English operations overlap to a great extent, it in no way suggests that SB plc is controlled by its American subsidiary. On the contrary, the evidence garnered by Denty leads to the unsurprising conclusion that the American subsidiary is controlled by its English parent. While the two entities have interrelated operations and common management, the common management is focused in England, at the corporation's primary headquarters. There may be central control of the two entities' labor relations, but again control lies in the English entity. Ownership too lies entirely with the English corporation, which wholly owns its American subsidiary.

Denty has produced no evidence to establish a genuine dispute of fact as to the control of SB plc. He can only claim that he applied for positions outside the United States for an English corporation. The ADEA has no application in this situation, and summary judgment is therefore granted to defendant on Denty's failure-to-promote claim.

## IV. The Extraterritorial Application of the PHRA

Although the ADEA explicitly provides for a limited any extraterritorial reach, the PHRA makes no provision at all for extraterritorial application. As discussed above, federal courts will only attribute to Congress an intent to apply federal law outside the United States when Congress has very explicitly expressed such an intention. The rationale for this reluctance—respect for the sovereignty of other nations within their territories—should make courts even more reluctant to apply state law outside the boundaries of the United States. Great mischief would be accomplished by allowing each state to regulate the conduct of individuals abroad. Without any evidence that Pennsylvania intended to apply the PHRA to decisions by an English corporation regarding positions in England—and no such evidence has been offered—this court concludes that the PHRA does not apply to the employment decisions at issue in this case.

Denty has not argued that the PHRA should be applied extraterritorially. Instead, Denty argues, as discussed above, that his complaint is of a purely domestic nature, in that at the time of the alleged discrimination he was working in the United States for an American employer. As I concluded above, this argument ignores the crucial facts that the positions Denty allegedly was denied on the basis of age were outside the United States, for an English employer. Because the complaint seeks to apply the PHRA extraterritorially, the claim under the PHRA must be dismissed.[4]

### Conclusion

As discussed above, Denty's failure-to-promote claims must be dismissed because the ADEA and the PHRA do not cover decisions regarding employment outside the United States for a foreign-run company.

---

4. Pennsylvania choice-of-law rules similarly lead to the conclusion that the conduct of an English corporation in filling positions in England and Australia is not governed by Pennsylvania law. Pennsylvania has adopted choice-of-law principles that it describes as "a flexible rule which permits analysis of the policies and interests underlying a particular issue before the court."

*Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa.1964). England and Australia clearly have strong interests in regulating the employment relations within their borders. In contrast, Pennsylvania's interest relates only to its interest in protecting American applicants for the positions at issue.